# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FAMILY INADA Co., Ltd.,

Plaintiff,

v.

FIUS DISTRIBUTORS LLC, D.B.A INADA
USA, D.B.A. FURNITURE FOR LIFE

Defendant.

: 
: 
: 
: 
: 
: 
: Civil Action No. 19-925-CFC
: 
: 
: 
: 
: 
: 
:

---

Daniel M. Silver, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Keith
Toms, MCARTER & ENGLISH, LLP, Boston, Massachusetts; Aya Cieslak-
Tochigi, MCARTER & ENGLISH, LLP, New York, New York

> *Counsel for Plaintiff*

Robert A. Penza, POLSINELLI PC, Wilmington, Delaware; Christina B. Vavala,
POLSINELLI PC, Wilmington, Delaware; John R. Posthumus, POLSINELLI PC,
Denver, Colorado

> *Counsel for Defendant*

## **MEMORANDUM OPINION**

October 18, 2019
Wilmington, Delaware

_Colm F. Connolly_

COLM F. CONNOLLY,
UNITED STATES DISTRICT JUDGE

Before me is Plaintiff Family Inada Co., Ltd.'s motion for a preliminary injunction. Family Inada seeks to enjoin Defendant FIUS Distributors LLC from using the DREAMWAVE trademark,  logo, DREAMWAVE.com webpage and domain name, and related marks (collectively, the "DREAMWAVE mark") to sell massage chairs. Family Inada and FIUS each claim ownership of the DREAMWAVE mark.

The parties agree that _Covertech Fabricating, Inc. v. TVM Building Products, Inc._, 855 F.3d 163 (3d Cir. 2017) provides the correct legal rule for deciding who owns the DREAMWAVE mark. Applying the _Covertech_ test to the facts adduced at a preliminary injunction hearing held on October 1, 2019, I find that Family Inada has a reasonable probability of succeeding in proving at trial that it owns the DREAMWAVE mark. I also find that Family Inada will suffer irreparable harm if it is not granted a preliminary injunction. Finally, I find, and FIUS does not dispute, that the equitable and public policy factors courts consider when deciding the merits of a preliminary injunction motion weigh in Family Inada's favor. Accordingly, I will grant Family Inada's motion for a preliminary injunction.

## I. BACKGROUND

Family Inada, founded and headed by its president, Nichimu Inada, is a Japanese company that manufactures high-end massage chairs for sale in numerous countries, including the United States. FIUS was Family Inada's exclusive distributor of chairs in the United States from 2008 to 2018. Preliminary Injunction Hrg. Tr. at 115–16 (October 1, 2019). From its inception, FIUS presented itself as an extension of Family Inada. Tr. at 127–28. The acronym FIUS stands for "Family Inada United States," and FIUS often did business under the name Inada or Inada USA. Tr. at 33, 127–28. For a time FIUS even had an "Inada" sign on the front of its building. Tr. at 142. For its part, Family Inada was more than happy to allow FIUS to use Family Inada's name and iconography, because Family Inada believed "FIUS was a great partner . . . [and] one that was very trustworthy." Tr. at 33. The trust Family Inada and FIUS had in each other was sufficiently great that the parties operated without a written agreement to govern their relationship. *See* tr. at 183.

In 2007 Family Inada began to sell the "SOGNO" massage chair in Japan. Tr. at 31. The following year, Family Inada worked with FIUS to bring the SOGNO chair to the United States. Tr. at 31. At FIUS's suggestion, Family Inada marked the SOGNO chairs that were distributed in the United States as "the SOGNO DREAMWAVE." Tr. 31-32. "Sogno" is Italian for "dream" and the

chair had a wave-like movement setting. Tr. at 31–32. FIUS's CEO Clifford Levin believed—and persuaded Family Inada—that "DREAMWAVE" would resonate with American consumers much better than "SOGNO" would. Tr. at 41.

In late 2013, Family Inada, with input from FIUS, began to develop a "DREAMWAVE 2.0" chair. Tr. at 106. When Family Inada launched the new-and-improved chair in 2014, it dispensed with "SOGNO" and marked the chairs "DREAMWAVE." Tr. at 106.

Just before the launch of the DREAMWAVE 2.0, Levin and Inada met in Japan. Tr. at 160, 173–74. Levin suggested at the meeting that someone should register the DREAMWAVE mark in the United States. Tr. at 160. Inada believed that the DREAMWAVE mark belonged to Family Inada "as a matter of course," as Family Inada had, as of 2013, been making chairs with the DREAMWAVE mark for five years for distribution in the United States and other countries. D.I. 45, ¶4. He therefore expressed no interest in seeking formal registration of the mark in the United States. Tr. at 161. Levin was "shocked" by Inada's seeming lack of interest, tr. at 161, and decided that he would have FIUS apply for registration of the DREAMWAVE mark with the United States Patent & Trademark Office (USPTO). Without telling Family Inada, FIUS filed for and obtained in 2014 registration of the mark from the USPTO. Tr. at 162; D.I. 31-1, Ex. 1.

In 2015, Family Inada's legal department learned that FIUS had registered the DREAMWAVE mark with the USPTO. Tr. at 79. In 2016, Family Inada sent to all its distributors, including FIUS, an "Agreement of Intellectual Property Rights." D.I. 31-1, Ex. 2; D.I. 44, ¶ 5. The agreement provided that "[w]ith regard to a mark that is marked onto [a] product made or developed by [Family Inada], Distributor may file the trademark application or may register the trademark thereof . . . at its costs and expenses." D.I. 31-1, Ex. 2 at 1–2. The agreement obligated the Distributor to assign to Family Inada upon termination of the Distributor's relationship with Family Inada, any trademark filed or registered by the Distributor pursuant to the agreement. *Id.* at 2. With respect to trademarks already registered by the Distributor, the agreement provided that the "detailed items and conditions for the license [of such marks] shall be separately discussed and determined between the parties hereto." *Id.*

Levin received the Agreement of Intellectual Property Rights by email in January 2016 from Masura Hanada, an Assistant Manager with Family Inada. D.I. 31-1, Ex. 3 at 4–5. Hanada reported directly to Inada and was responsible for Family Inada's dealings with its distributors throughout the world. Tr. 29.

Rather than reply to Hanada's email, Levin forwarded it to Masaki Kagano, a consultant employed at the time by Family Inada to act as "an intermediary," translator, and interpreter, in Family Inada's dealings with FIUS. Tr. at 86. In

truth, Kagano acted as FIUS's double agent, not Family Inada's intermediary. Unbeknownst to Family Inada, FIUS paid Kagano $60,000 in 2015, $60,000 in 2016, and $200,000 in 2017, tr. 162; and it is clear from Kagano's written communications with Levin that the two men had been plotting before 2016 to start their own "new business" that would "still remind consumers [and the] market" of "what [FIUS had] built with INADA." D.I. 31-1, Ex. 3 at 2.

In the email forwarding Hanada's January 2016 email to Kagano, Levin wrote that the Agreement of Intellectual Property Rights "present[ed] some issues because we have in fact registered" three marks, including the DREAMWAVE mark. D.I. 31-1, Ex. 3 at 2. Levin stated that his "simple preference is to not sign this, but my guess is that this is not a possible position for us to take." *Id.* Levin noted further that "it is so so strange to me that [Family Inada] ask[s] for this now. It's only 6-10 years too late :-) Just kind of funny actually what seems to suddenly matter to Family." *Id.*

In his reply email to Levin, Kagano explained that a recent trademark dispute with Family Inada's distributor in China was the reason why Family Inada had "start[ed] claiming [sic] for this [agreement] now." *Id.* at 1.[1] Kagano told

---

[1] At the hearing, Hanada testified using an interpreter. He was asked: "Is it your testimony here today that the Family Inada response to learning about the FIUS federal registration was to propose the intellectual property rights agreement[?]" Tr. at 81. He responded: "Yes, but I would also add that I myself thought given the very strong relationship that we had the[n] with FIUS and the trust that existed

5

Levin that "it is difficult not to sign" the agreement but that he "totally underst[oo]d" Levin's hesitancy to sign. *Id.* at 1–2. He continued:

> But either way, I am not sure if I can believe in the idea of using the names which had been used for INADA products if we are creating new business and try[ing] to make it major …. this will definitely create bloody, ugly war, no matter if you/we have a legal winning chance at legal battle. While we/you maintain INADA business, I think we need to build something different which can be utilized for new business(KT?) [sic], it is really unfortunate that we can't use the names which you have invested money, time, energy, brane [sic], everything ….
>
> Can't we come up with some different names newsly [sic], which still remind consumers/market to imagine what you have built with INADA? Similar sound? Similar logo, … etc?

D.I. 31-1, Ex. 3 at 2 (ellipsis in original).[2]

---

between us with FIUS, that the matter was not perceived as one that required urgency." Tr. at 82. In light of the series of questions, objections, and arguments by counsel that immediately preceded this question, I had substantial doubts at the time of this testimony that Hanada understood the question to which he responded. In any event, Kagano's explanation in his email to Levin that Family Inada's dispute with its China distributor was the reason Family Inada sent the intellectual property agreement to its distributors makes sense and Kagano would have had no reason to offer this explanation were it not true. *See* D.I. 31-1, Ex. 3. Kagano's explanation is also consistent with other portions of Hanada's testimony and with Hanada's sworn declaration that the agreement was sent to all distributors, not just FIUS. D.I. 44, ¶ 5.

[2] Levin testified at the hearing that "KT" stands for Kon Tai, the company that manufactures the chairs FIUS currently sells under the DREAMWAVE mark. Tr. 164–165.

Levin and Kagano did not come up with a different name, but they did launch their new business, which they called "Project X." D.I. 31–1, Ex. 5; tr. at 164–65. The scheme was simple. First, FIUS would not execute the intellectual property agreement or otherwise acknowledge Family Inada's ownership of the DREAMWAVE mark. Then, FIUS would slowly unwind its business with Family Inada, find a different manufacturer (*i.e.*, KT) to build a chair similar to the DREAMWAVE, and then launch that new chair under the DREAMWAVE mark. D.I. 31–1, Ex. 5.

Once it became clear that FIUS would not sign the intellectual property agreement and not knowing that Kagano was being paid by FIUS, Family Inada employed Kagano to interpret and facilitate communications with Levin to resolve the parties' dispute over the ownership of the mark. Tr. 86–87.

Levin and Kagano intentionally slow-walked the negotiations with Family Inada as they worked to develop and launch their competing massage chair. They led Family Inada to believe that Levin was constrained by "corporate governance and banking issues" from assigning the registered DREAMWAVE mark to Family Inada. *See* D.I. 45, ¶¶6-7 and Ex. 21; D.I. 31-1, Ex. 4. And they stalled the parties' negotiations to resolve their ownership dispute. As Kagano put it in an email to Mr. Levin:

> When you write a letter [to Inada], I think you could imply that you need upto [sic] 1 year or so to completely fade out

> [DREAMWAVE] and unify [sic] to INADA to avoid market confusion/drastic dropping [sic] the sales etc., even though you want to meet his request as soon as possible. Let's drag as much as we can . . . we may be able to threaten him not to be too [sic] hurry us by telling him quick change will create unrecoverable sales drop, and brand hurting [sic]. Please show me your draft tomorrow and let's complete it by Monday . . .

D.I. 31–1, Ex. 5 (ellipsis in original). Part of "drag[ging] as much as we can" meant lying to Family Inada about FIUS's plans for the DREAMWAVE mark. D.I. 31–1, Ex. 5. Kagano recommended that Levin write to Family Inada agreeing to not use the DREAMWAVE mark while simultaneously working with Levin to start Project X "using" DREAMWAVE. D.I. 31–1, Ex. 5. The logic was that such an agreement would not bind FIUS, but it would mollify Family Inada until FIUS could bring Project X to market.

Eventually the negotiations stalled completely, and FIUS and Family Inada ended their working relationship in 2018. Tr. at 83.

In January 2019, Project X had what Levin called its "big coming out party" at the Consumer Electronics Show (CES). Tr. at 104. FIUS presented at its CES booth its new chairs from China. Both the booth and the chairs were labeled with the DREAMWAVE mark. Tr. at 46. Family Inada also attended the CES and it was there it first learned that FIUS was using the DREAMWAVE mark on chairs not manufactured by Family Inada. Tr. at 47. FIUS currently sells these non-Family-Inada chairs as "new DREAMWAVEs." Tr. at 48. It also sells the Family

8

Inada chairs it has in stock under the name "CLASSIC DREAMWAVE." Tr. at 48.

In May 2019, Family Inada filed this law suit. Family Inada seeks in its complaint injunctive and monetary relief under the Lanham Act, 15 U.S.C. 1125, the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2532, and Delaware common law trademark infringement and unfair competition. Family Inada also seeks cancellation of FIUS's trademarks under 15 U.S.C. §§ 1064, 1092, 1119, and 1120, and declaratory relief under 28 U.S.C. § 2201 *et seq.*

## II.   LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy" that "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits" and he will "suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Third Circuit has equated "likely to succeed on the merits" with "a reasonable probability of eventual success in the litigation." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974). A "reasonable probability" is "significantly better

than negligible but not necessarily more likely than not." *Id.* at 179. Irreparable

harm must be established by a preponderance of the evidence. *Id.*

If a Plaintiff can meet its burdens on the first two factors, then the Court

should consider two more factors: whether "the balance of equities tips in

[Plaintiff's] favor" and whether "an injunction is in the public interest." *Winter*,

555 U.S. at 20. At that point, the court should balance all four factors to determine

if taken together they "favor . . . granting the requested preliminary relief." *Reilly*,

858 F.3d at 179.

## III.  DISCUSSION

### A.  Family Inada Has a Reasonable Probability of Eventual Success in the Litigation.

For Family Inada to succeed on the merits, it must establish that it is the

rightful owner of the DREAMWAVE mark. Under Third Circuit law, when a

manufacturer and its exclusive distributor each claim ownership of a trademark,

courts apply the *Covertech* test. *See Covertech Fabricating, Inc. v. TVM Building

Prods., Inc.*, 855 F.3d 163 (3d Cir. 2017). Courts presume in such cases that the

manufacturer owns the trademark unless the distributor can rebut that presumption

using a six-factor balancing test. *Id.* at 171. The *Covertech* factors are:

> (1) which party invented or created the mark;
>
> (2) which party first affixed the mark to goods sold;

10

(3) which party's name appeared on packaging and promotional materials in conjunction with the mark;

(4) which party exercised control over the nature and quality of goods on which the mark appeared;

(5) to which party did customers look as standing behind the goods, *e.g.*, which party received complaints for defects and made appropriate replacement or refund; and

(6) which party paid for advertising and promotion of the trademarked product.

*Id.* There is a "thumb on the ownership scale in favor of the manufacturer" but a court should still perform "a thorough, individualized analysis of each case." *Id.* That analysis should "consider the various indicia of ownership designed to elicit the roles and responsibilities of the parties and the expectations of consumers in order to gauge whether, in a given case, the distributor and not the manufacturer operated as the rightful owner of the contested mark." *Id.*

In its brief filed in opposition to Family Inada's preliminary injunction motion, FIUS argued that *Covertech* did not apply to this case and that FIUS was the presumptive owner of the DREAMWAVE mark because FIUS had successfully petitioned the USPTO to register the mark in its name. D.I. 30 at 6. In FIUS's words: *Covertech* "only applies to resolving ownership of an 'unregistered' mark, which is not the case here." D.I. 30 at 6. In fact, the contested mark in *Covertech*, like the DREAMWAVE mark in this case, had been registered by the distributor. 853 F.3d at 169. At the preliminary injunction

hearing, FIUS agreed that *Covertech* governs the parties' ownership dispute. Tr. at 28. Accordingly, I examine the six *Covertech* factors in turn and then consider them in their totality.

## 1. Creator of the Mark

The parties agree that Levin created the DREAMWAVE mark. Tr. at 54–56. Thus, the first factor weighs in FIUS's favor.

## 2. First to Affix the Mark

The parties agree that Family Inada first affixed the DREAMWAVE mark to a massage chair. Tr. at 56. Thus, the second factor weighs in Family Inada's favor.

## 3. Name on Packaging and Promotional Materials

The parties agree that Family Inada's name appeared in conjunction with the DREAMWAVE mark on packaging and promotional materials. Tr. at 56–57. The shipping box for the DREAMWAVE chair had Family Inada's name on it. Tr. at 56. The chair's user manual had Family Inada's name on it. D.I. 51. FIUS used Family Inada's name throughout its website and sales materials, and routinely presented itself as simply "Inada" in an effort to tie itself to the larger Family Inada name and reputation. Tr. at 57., 127–128. Thus, the third factor weighs in Family Inada's favor.

### 4. Control Over the Nature and Quality of the Marked Goods

The parties agree that Family Inada exercised control over the nature and quality of the DREAMWAVE massage chairs it manufactured. Tr. at 56. FIUS had no role in the manufacturing process and no responsibility for design or quality control. Insofar as FIUS had any input, it was in the form of suggestions Family Inada was free to ignore. Tr. at 58. Thus, the fourth factor weighs in Family Inada's favor.

### 5. The Party Viewed as Standing Behind the DREAMWAVE

Although FIUS performed the warranty service for the DREAMWAVE chairs, it marketed the warranty as a manufacturer's warranty and presented itself as Inada when it interacted with customers. Tr. at 143–44. In written materials and on its website, for example, FIUS put the Inada name next to the phone number customers were given to call for technical assistance and warranty work. D.I. 51. When customers called that number, the service representative would pick up and say something to the effect of "[t]hank you for calling Inada." Tr. at 140. Although Levin is likely correct that customers did not believe that their chairs would be serviced in Japan, the only reasonable inference customers would draw from FIUS's use of the Inada name and marks was that Family Inada serviced and stood behind the DREAMWAVE chairs. Tr. at 145–46. Thus, Family Inada has

shown that customers looked to it as standing behind the product and the fifth factor weighs in its favor.

### 6. The Party Responsible for Advertising and Promotion

The parties agree that FIUS paid for and oversaw the advertising and promotion of the DREAMWAVE chair in the United States. Tr. at 58. FIUS's role as distributor was to promote and sell the product, and it alone did that work in the United States. Tr. at 122; Tr. at 94. Thus, the sixth factor weighs in FIUS's favor.

### 7. The Totality of the *Covertech* Factors Favors Family Inada

Having reviewed all six factors, I conclude that it is likely that Family Inada would succeed at trial in establishing its ownership of the DREAMWAVE mark. Four of the six factors favor Family Inada. "While a mere counting of the factors is not dispositive," *Covertech,* 855 F.3d at 174, the number and relative weight of the factors strongly favor Family Inada. "The function of a trademark is to identify the origin or ownership of the article; the essence of the wrong is the passing off of the goods of one manufacturer or vendor as those of another." *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 461 (3d Cir. 1968) (citing *Delaware & Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall.) 311, 322 (1871)). Family Inada made the original DREAMWAVE chair, and FIUS intentionally— and successfully—marketed the chair as a Family Inada product. Although FIUS

created the mark, that is less important than what the mark did for the past decade—namely, signify that chairs marked DREAMWAVE were manufactured, guaranteed, and serviced by Family Inada. In short, I find that in light of the presumption of ownership Family Inada enjoys and the four *Covertech* factors that weigh heavily in its favor, Family Inada has a reasonable probability of proving at a trial it owns the DREAMWAVE mark. It has therefore met its burden to show a likelihood of success on the merits.

## B. Family Inada Can Show Irreparable Harm

A party moving for a preliminary injunction in a trademark case "is not entitled to a presumption of irreparable harm[.]" *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014). Instead the movant "is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted." *Id.* A "critical aspect" of fact finding in this context is "drawing reasonable inferences from facts in the record." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014). Bases for irreparable harm in Lanham Act cases include "loss of control of reputation, loss of trade, and loss of goodwill." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992). The Court may only grant a preliminary injunction when a movant has made "a clear showing of a likelihood of irreparable harm." *Groupe*, 774 F.3d at

204. The movant must make this showing by a preponderance of the evidence. *See Reilly*, 858 F.3d at 179.

Based on the evidence adduced at the preliminary injunction hearing, I find that Family Inada has made a clear showing that, absent an injunction, it will suffer irreparable harm in the form of lost reputation and good will. The record makes clear—indeed, it is essentially undisputed—that Family Inada's DREAMWAVE chair is an iconic brand tied to a premium massage chair known to be of high quality and, most importantly, known to be made and serviced by Family Inada. It is similarly clear that FIUS is openly trading on Family Inada's reputation and goodwill associated with the DREAMWAVE mark to promote sales of the new DREAMWAVE chair. For example, Ian Hays, FIUS's Vice President of Sales, stated in a recent marketing video made with a prominent massage chair dealer that FIUS, in developing the new DREAMWAVE chair, "sought to add to the DREAMWAVE story" that traces its roots to the original DREAMWAVE chair, which FIUS now labels the "DREAMWAVE Classic." D.I. 20–1 at 185. In Hays' words:

> the DreamWave Classic … has been in the market for 10 years and really we believe [it] is an iconic massage chair in the premium massage chair category, something certainly that is recognized. So for those loyal followers or those people that have owned DreamWave in the past, this is something that has been long awaited, the release of a new DreamWave.

D.I. 20–1 at 185.  At a later point in the video, Hays and the dealer engaged in the

following discussion:

> **Dealer**: And the warranty on this chair is going to
> be similar to all the other DreamWave products or the
> other products you sell?
> **Hayes**: Yeah, I really appreciate the plug on our
> service and we believe that when you purchase a luxury
> product you deserve to experience luxury after the sale,
> service and I know your company pays a great deal of
> attention to that as well, and yes we have not sacrificed on
> that with the new DreamWave it continues to be the three-
> year all parts, all labor, in-service home warranty that our
> customers have enjoyed for, since forever.
> **Dealer**: Since you started.
> **Hayes**: Yeah, since we started.
> **Dealer**: Well Inada's fantastic that way.  You have
> great customer support . . .

D.I. 20–1 at 189.  This exchange makes clear that FIUS knows that customers

equate Family Inada with the high quality and service associated with the

DREAMWAVE mark.  Hays began the video by promoting FIUS's new chair as a

continuation of Family Inada's DREAMWAVE story and he did nothing to

disabuse the dealer of the notion that FIUS and Inada are one and the same.  In this

way, he implemented the strategy Levin and Kagano discussed when they were

developing Project X—that is, to "remind consumers/market to imagine what you

have built with INADA[.]"  D.I. 31-1, Ex. 3 at 2.

When FIUS was Family Inada's distributor in the United States, it presented

itself to the market as part of Family Inada by using the Inada name and

17

DREAMWAVE mark. Although no longer connected to Family Inada, FIUS is still using the DREAMWAVE name to try and capitalize on Family Inada's reputation and good will. Accordingly, Family Inada has shown that it will be irreparably harmed absent an injunction enjoining FIUS from using the DREAMWEAVE mark.[3]

## C. FIUS Waived Any Argument on the Equitable or Public Interest Considerations

FIUS did not address the equitable and public-interest considerations of the preliminary injunction analysis in its Answering Brief or at the preliminary injunction hearing. *See* D.I. 30, Tr. at 201. "It is well established that failure to raise an issue . . . constitutes a waiver of the argument." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991). Even so, the Court will briefly discuss those considerations and how they favor Family Inada.

---

[3] Family Inada advanced two other arguments for why it will be irreparably harmed unless the Court grants an injunction: (1) Its new United States distributor is "reluctant" to sell Family Inada's DREAMWAVE chairs while this litigation is ongoing, tr. 51; and (2) it has lost or will lose market share, D.I. 7 at 19. Family Inada, however, did not adduce evidence to establish that its new distributor had refused to sell Family Inada chairs absent an injunction. And it failed to adduce any evidence to show that it had lost sales or market share. Accordingly, I gave no weight to these arguments.

When considering the balance of equities, a court must "explore the relative harms to applicant and respondent[.]" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). As explained above, Family Inada has shown that it will be harmed by losing control of its reputation, the reputation of the DREAMWAVE, and the good will those reputations fostered. In contrast, to the extent FIUS will be injured by not being able to sell its new chair using the DREAMWAVE mark, that injury "may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). Thus, the equities weigh in favor of Family Inada.

As for public interest considerations, the public has an interest in not being "deceived or confused." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). Until January 2019, chairs sold under the DREAMWAVE mark were made by Family Inada. If FIUS is permitted to sell chairs made by a different manufacturer under the DREAMWAVE mark, it will almost certainly deceive or confuse customers into believing the chairs were made by Family Inada.

The public also has an interest in not rewarding unscrupulous business practices. In a plot that unfolded over three years, FIUS made a play to take the DREAMWAVE mark, convinced Family Inada's intermediary to become a double

19

agent for FIUS, used that double agent to execute a scheme to bring a competing chair to market under the DREAMWAVE mark, and all the while deceived Family Inada—a longstanding and amicable business partner—as to the state of their relationship and FIUS's intentions.

Accordingly, the public interest weighs in favor of granting the preliminary injunction.

## D.    Waiver of Bond Requirement

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper . . ." Fed. R. Civ. P. 65(c).  There are, however, cases in which the bond requirement can be waived.  *See Temple Univ. v. White*, 941 F.2d 201, 219–220 (3d Cir. 1991).  In cases that raise the issue of a bond waiver, "the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant."  *Id.* at 219. Defendant has not requested a bond.  Tr. at 193.  And the hardship FIUS faces is minimal:  Although FIUS will not be able to sell chairs using the DREAMWAVE mark, this injunction will not prohibit it from selling chairs.  Thus, the Court determines that waiver of the bond requirement is appropriate.  *Cf. Mullin v. Sussex Cty., Del.*, 861 F.Supp. 2d 411, 428 (D. Del. 2012).

## IV. CONCLUSION

For the above reasons, I will grant Plaintiff's motion for a preliminary injunction.

The Court will issue an Order consistent with this Memorandum Opinion.